Leon MITCHELL et al., Appellants,

v.

Raymond MITCHELL et al., Appellees.

No. 5043.

Court of Civil Appeals of Texas.

Beaumont.

Jan. 4, 1957.

Rehearing Denied Jan. 30, 1957.

Alto V. Watson, D. F. Sanders, Beaumont, Black & Stayton, Austin, for appellants.

Morris, Underwood & Oldham, Houston, Graves, Underwood & Greenhill, Austin, W. J. Durham, Dallas, R. E. Biggs, Liberty, E. E. Davis, Dayton, for appellees.

PER CURIAM.

Aurelia Mitchell died on March 18, 1940, leaving a will by which she created a trust for children of hers and descendants of her children. The income from this trust was payable to her children, excepting a daughter, and to the children of the excepted daughter during the lives of these people and afterward to their descendants until 21 years after the death of the survivor of the group to whom the income was first payable. When the term of the trust ended, the property in trust was to be divided among the descendants of the group first entitled to income. For convenience, we shall refer to beneficiaries who have become entitled to income as life income beneficiaries and to the rest of the beneficiaries as remaindermen. The trust estate included Aurelia Mitchell's one half community interest in a 400 acre tract of land in the M. G. White League in Liberty County, together with oil and gas leases on this interest made by her, and it is the trustees' disposition of oil and gas royalties from this land although not under these leases, which caused this suit to

be brought. The parts of the will material to the issues between the parties are quoted and discussed in the opinions of the Court of Civil Appeals and of the Supreme Court reported sub nomine Mitchell v. Mitchell at Tex.Civ.App., 235 S.W.2d 744 et seq., and 151 Tex. 1, 244 S.W.2d 803 et seq. The appeal now pending is a second appeal in that case, although new parties have been added and some new issues have been made since the Supreme Court's mandate was returned to the trial court.

The trial court, after the mandate had been returned, rendered a judgment which, among other things, purported to construe the will of Aurelia Mitchell and in consequence declared proceeds from the sale of oil, gas and other minerals belonging to the estate to be corpus of the trust and not income. Because of the nature of the litigation the proceeds just referred to included oil and gas royalties paid under mineral leases. This part of the judgment was amended. This judgment provided further, in substance, that issues arising on an accounting of the trustees and between them and others liable to them in consequence of their accounting were severed and docketed separately, and by the amendment mentioned provided still further, in substance, that in the part of the suit thus severed the trustees might litigate the question (if it had not been decided by the Supreme Court) whether income payable included the oil and gas royalties paid to the trustees under the Sun Oil Company lease. This 'lease existed, and oil and gas was being produced therefrom, at Aurelia Mitchell's death and at the trial of which the judgment now on appeal was rendered. The aforesaid judgment, rendered after return of mandate, also appointed the American National Bank an additional trustee.

When the aforesaid judgment after mandate was rendered, the plaintiffs were the remainderman not entitled to income, although in the petition the plaintiffs were described as a class in terms broader than the class actually existing. The defend-

ants were the trustees, Leon and Vick Mitchell, sons of Aurelia Mitchell and original income beneficiaries. After the rendition of the judgment after mandate, these trustees made all beneficiaries of the trust parties to the suit, both the life income beneficiaries (including the survivors of the original group) who were not parties to the suit before that time and all others, and answers were filed by most of these people. Of the pleadings filed by the parties it is enough to say that the questions discussed in this opinion are supported by the pleadings; but specifically, these issues are raised by the pleadings of the appellants Mary Prophet and Agnes King and their husbands, Agnes and Mary being daughters of testatrix and among the original life income beneficiaries; and said issues are also raised by the pleadings of Cornelius Mitchell and his group of appellants, who include at least two of the original life income beneficiaries, children of testatrix, one being the said Cornelius.

The cause was tried to the court without a jury. The judgment rendered decreed another severance in the cause, leaving certain issues undecided. This judgment also fixed the amount of the trustees' indebtedness to the trust, mostly as reimbursement for sums paid as income out of oil and gas royalties from the 400 acre tract referred to above but also in smaller part for payments not accounted for. Still further, the judgment determined the sums of money which each of the income beneficiaries had received from the trustees and awarded the trustees a recovery of these sums from the beneficiaries for the benefit of the trust, with some limitations, not necessary to be repeated, on the methods of enforcement as against certain minors. The trustees were also adjudged the right to withhold income from these beneficiaries, excepting said minors, both to reimburse the trust and trustees Leon and Vick Mitchell. Still further, the judgment decreed that proceeds of oil, gas and other minerals were corpus of the trust estate and not income, and this provision is to

be construed as including oil and gas royalties. We omit other provisions of the judgment.

From this judgment the trustees and some of the life income beneficiaries and descendants of another of these beneficiaries have appealed. Findings of fact and conclusions of law were made and filed by the trial court, and a transcript of the evidence has also been filed.

We make the following holdings, which will adjudicate the appeal.

## I.

*The questions concerning the effect to be given the Supreme Court's judgment, by way of res judicata or otherwise.*

■ This suit, as filed, was No. 13,751 in the trial court. Finding 11 of the trial court's original findings reads: "None of the beneficiaries under the will of Aurelia Mitchell who was then entitled to share in the distribution of income from the Aurelia Mitchell Trust estate was a party to Cause No. 13,751, Raymond Mitchell, et al. v. Leon Mitchell, et al., in the District Court of Liberty County, Texas, except Raymond Mitchell, Leon Mitchell and Vick Mitchell."

This finding is certainly correct in fact as regards named parties, for the only persons named as parties were the three mentioned in the finding.

Furthermore, the finding is correct in law. Raymond Mitchell brought the suit as a member of and for a class. In his petition he described this class as "all of the grandchildren and great grandchildren of Aurelia Mitchell, deceased, adults and minors, representing such of the minors who have no legal guardian of their estates as their next friend, and in behalf of all of the yet unknown grandchildren and great grandchildren of Aurelia Mitchell, deceased, who may be beneficiaries under the terms and provisions of her last will and testament. This suit is brought by the plaintiff under Rule 42, Rules of Civil Procedure in behalf of a class of persons so numerous as to make it impracticable to bring all of them before the Court, the living grandchildren and great grandchildren of Aurelia Mitchell now numbering approximately 200 persons."

However, the object of the suit was to stop the practice, followed by trustees Leon and Vick Mitchell, of paying oil and gas royalties to the life income beneficiaries; and because the plaintiffs alleged in paragraph 2 of the petition that oil and gas "is now being produced" from certain land of testatrix (the 400 acres referred to above) and alleged further in paragraph 6 "that during the year 1947 oil and gas was discovered and has been produced in large quantities from the aforesaid property", we construe the petition as referring only to the royalties from the 200 acres leased to Gainer in 1946 by the lease which the trial court refers to in Finding 8 of the Original Findings. That the Supreme Court also construed the petition as referring only to this tract is shown by the quotation hereinafter made from that part of their opinion at 244 S.W.2d 805 and the results of this construction are pointed out in part IV of this opinion, in our discussion of the quotation. Plaintiffs sought to recover from the trustees $100,000 for wrongful payments and excessive commissions, and also sought an accounting, alleging that they could not be certain as to "the exact amount of money heretofore collected by the defendants as rentals and royalties for the estate of Aurelia Mitchell; but they believe the defendants have collected sums far in excess of—($100,000.-00)." The figures are cited to indicate the value of the property which the plaintiffs proposed to take away from the income beneficiaries and appropriate to their own benefit by having it classified as corpus of the estate instead of as income. The facts show that some members of the class whom Raymond Mitchell purported to represent actually were among the income beneficiaries to whom the trustees had made payments from oil and gas royalties and so had

interests in flat conflict with the object of the suit. These people, if plaintiffs won the suit, were not only subject to the potential loss of valuable property which we have indicated; they were also subject to potential liability for the payments made to them. And the plaintiffs actually did win the suit. Obviously, neither Raymond Mitchell nor his successor appointed by the Court of Civil Appeals either could or did represent the life income beneficiaries who happened to be among the class described as plaintiffs in the petition and these people did not become parties plaintiff through representation by Raymond Mitchell or his successor. See Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22, 132 A.L.R. 741 and annotation following; Fischer v. Porter, 263 Ky. 372, 92 S.W.2d 368.

There were a large number of income beneficiaries included in the class for whom Raymond Mitchell purported to sue. First, there were the seven children of testatrix' daughter Theresa who were named in the will among the original income beneficiaries. Second, there were the seven children of testatrix' son Fuhr Mitchell who, on their father's death, had succeeded to his share of the trust's income. We note that Vick Mitchell, sued originally as trustee, was alleged to have succeeded Fuhr Mitchell as trustee on the latter's death. Third, another of testatrix' sons and one of the original income beneficiaries, Sostan Mitchell, has died, leaving two children to whom his share of the trust's income passed, and since the trustees made payments to these children and since the judgment appealed from has awarded a recovery of these sums from these children, we infer that they, too, were life income beneficiaries when the suit was filed. We note that on the first trial, Leon Mitchell testified that Sostan Mitchell was dead. Some of these sixteen persons are appellants among the group of appellants headed by Cornelius Mitchell.

The next question then is, whether the life income beneficiaries, those just referred to, and also the testatrix' children surviving, were parties defendant to the suit by virtue of representation by Leon and Vick Mitchell, either as trustees or as life income beneficiaries, for these two were also sons of testatrix, named in the will among the original group of life income beneficiaries. We conclude that Leon and Vick Mitchell did not, in their capacity as trustees, so represent the life income beneficiaries as to make said beneficiaries parties to the suit (although as we pointed out in American National Bank v. Biggs, Tex. Civ.App., 274 S.W.2d 209, Leon and Vick Mitchell rightly did defend their construction of the will, made in good faith on advice of counsel and with reasonable grounds for their construction, and this action was in the interest of the income beneficiaries). There is nothing in the will which purports to give the trustees that power of representation, and therefore the rule is to be applied which precludes the trustee's representing beneficiaries where the beneficiaries' rights between themselves are in question. As we have pointed out, the plaintiffs in the suit as brought by Raymond Mitchell were beneficiaries by way of remainder, and the object of the suit was to deprive the life income beneficiaries of valuable oil and gas royalties and appropriate these royalties to the remaindermen's own benefit by putting said royalties into the corpus of the trust. The consequence, as we have also pointed out, was both to subject the income beneficiaries to potential loss of this property and to potential liability for the sums paid them out of this property. See Bogert on Trusts and Trustees, Section 593, and the citations made in the second paragraph following.

We also conclude that Leon and Vick Mitchell did not, in their capacity as income beneficiaries, represent the other members of this group. They were not sued as representatives of a class. They filed no pleading and did no act purporting to be in representation of a class. Instead, they alleged that the children of

testatrix named in the will were necessary parties—and the plaintiffs contested this allegation in paragraph 2 of their supplemental petition and in argument at the opening of the first trial. Still further, we find no circumstance in evidence which required class representation of the income beneficiaries, and we note that they have been made parties to the present proceeding as individuals, by name.

We do not have the question, whether any income beneficiary was bound by the Supreme Court's judgment because of reasons and grounds other than those we have discussed. The following citations pertain to matters we have referred to above: (a) *Rights against an income beneficiary to whom a part of the corpus has been paid because of a mistaken interpretation of the declaration of trust:* Scott on Trusts, Sections 254, 254.1, and 254.2; Bogert on Trusts & Trustees, Section 191, p. 208; Section 814, p. 205; Restatement of Trusts, Section 251 and Comments (c) and (e); Section 254 and Comments (a), (d) and (e); Section 256 and Comment (c); 90 C.J.S., Trusts, § 345, p. 608, §§ 352, 353, 354, p. 627, §§ 436–437, p. 839. (b) *Necessity for the joinder of the income beneficiaries as parties if they were to be bound by the judgment, and the trustees' lack of capacity to represent them as a class in defending the suit.* Galveston H. & S. A. R. R. Co. v. Butler, 56 Tex. 506; Hudson v. C. Eisenmayer Milling & Elevator Co., 79 Tex. 401, 15 S.W. 385; Lyon-Thomas Hdw. Co. v. Perry Stove Mfg. Co., 88 Tex. 468, 27 S.W. 100; Cotton v. Coit, 88 Tex. 414, 31 S.W. 1061; Cavers v. Sioux Oil & Ref. Co., Tex.Com.App., 39 S.W.2d 862; Powell v. Parks, 126 Tex. 338, 86 S.W.2d 725; Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, at page 382; Whitsett v. Whitsett, Tex.Civ. App., 201 S.W.2d 114; Johnston v. Stinson, Tex.Civ.App., 215 S.W.2d 218; Franz v. Buder, 8 Cir., 11 F.2d 854; Baird v. Peoples Bank & Trust Co., 3 Cir., 120 F. 2d 1001; Talbutt v. Security Trust Co.,

D.C., 22 F.Supp. 241; Shirk v. Walker, 298 Mass. 251, 10 N.E.2d 192, 125 A.L.R. 620; Speakman v. Tatem, 45 N.J.Eq. 388, 17 A. 818; Mitau v. Rodden, 149 Cal. 1, 84 P. 145, 6 L.R.A.,N.S., 275; McPherson v. Parker, 30 Cal. 455; Stevens v. Melcher, 53 Hun 636, 6 N.Y.S. 811, at page 818; Lee v. Taylor, 186 App.Div. 199, 174 N.Y.S. 203; Elam v. Garrard, 25 Ga. 557; Dill v. McGehee, 34 Ga. 438; Fish v. Berkey, 10 Minn. 199, Gil. 161; Johnson v. Long, 235 Ala. 283, 178 So. 54, at page 58; 65 C.J. 899, Sec. 795; 90 C.J.S., Trusts, § 390.

The income beneficiaries omitted from the suit as brought, and at least some of the appellants here are of that group, are not bound by the judgment of the Supreme Court and are free to litigate their right to the oil and gas royalties and the proper interpretation of the will. This is true not only of the rules of res judicata but also of other rules concerning the effect to be given a judgment. There are new parties to the suit who are not bound by the Supreme Court's judgment. As will appear hereinafter, there is a great deal of evidence now in the record which was not proved on the trial appealed to the Supreme Court. Too, all parties interested in the result of the suit are now parties to the suit, and rights of third parties are not involved in the suit. So rules which pertain to the doctrines of stare decisis and the law of the case on a second appeal are also not to be applied against the omitted income beneficiaries so as to deny them the right to litigate again the questions decided on the first appeal. Thus in Frankland v. Cassaday, 62 Tex. 418, at page 420, the Commission of Appeals stated this about the rule of *stare decisis:* "The application of this rule, however, contemplates that the facts on the second appeal shall be substantially the same, or rather, perhaps, that they shall not be such as to affect materially the legal questions involved under the first appeal." And see Goodwin v. Hidalgo

County Water Control & Improvement District No. 1, Tex.Civ.App., 58 S.W.2d 1092. Nor do the rules concerning the effect of instructions to a trial court in a Supreme Court mandate have any application for, as we have pointed out, the issues on this appeal are supported by the pleadings filed by life income beneficiaries who were not bound by the Supreme Court's judgment. The instructions in the Supreme Court's mandate were not directed against persons not bound thereby.

The action of the Supreme Court in overruling the trustees' motion for rehearing, in which the trustees assigned the absence of beneficiaries as a ground, has no bearing on the questions we have discussed. The ground of the court's action is not clear, no opinion having been filed on rehearing and the plaintiffs having stated several arguments in reply to this ground, but at the very most the court's order implies only that the omitted beneficiaries were not indispensable to rendition of a judgment against the trustees. The fact that the trustees might have been bound by the Supreme Court's judgment if the second trial had not occurred or had taken a different course is not material to the question, whether the omitted beneficiaries themselves are bound by that judgment.

However, it is a necessary consequence of all these conclusions that the trustees also are not bound by the Supreme Court's judgment so far as the judgment rendered on this appeal is inconsistent with those previously rendered against the trustees. For all interested parties are before the court and the trustees could not perform both judgments as rendered; they could not administer the trust as the will provides. If the life income beneficiaries establish any rights against the remainderman on this proceeding, the trustees must perform the last decree and deal with oil royalties and other funds as the last decree directs. This matter, and matters related to it, are discussed in part V. of this opinion.

## II.

### *Questions respecting the application of the "open mine" doctrine.*

The facts pertaining to this group of questions are remarkable. As we have stated, Aurelia Mitchell owned in fee an undivided one half of the 400 acre tract. Beginning with a lease dated June 28, 1916, on the western 200 acres of the 400 acres, Aurelia Mitchell participated in the execution of thirteen oil and gas leases covering parts of the 400 acres. Every part of the 400 acres, at one time or another during the period between the lease of June 28, 1916, and the death of Aurelia Mitchell on March 18, 1940, was subject to one or more of these leases. Cash bonuses paid for these leases exceeded $50,000. The following table showing these leases is taken from the original brief of Mary Prophet, et al.:

| Lease Number | Date Executed | Portion of the 400 acre tract covered by the lease |
|---|---|---|
| 1 | June 28, 1916 | West 200 acres |
| 2 | March 9, 1917 | South ½ of East 200 acres |
| 3 | March 22, 1917 | North ½ of East 200 acres |
| 4 | August 24, 1920 (extended in 1924) | West 100 acres |
| 5 | January 5, 1921 | 100 acres immediately East of the West 100 acres |
| 6 | June 1, 1923 | 10 acres immediately East of the West 200 acres |
| 7 | December 9, 1924 | 50 acres immediately East of the West 100 acres |
| 8 | January 3, 1925 | 20 acres immediately East of the West 150 acres |
| 9 | February 26, 1925 | 25 acres immediately East of the West 170 acres |
| 10 | March 5, 1925 | 30 acres immediately East of the West 195 acres |
| 11 | March 12, 1925 | 15 acres immediately East of the West 225 acres |
| 12 | January 15, 1926 | 45 acres immediately East of the West 150 acres |
| 13 | April 18, 1935 | 150 acres immediately East of the West 150 acres |

Some of these leases were productive. Lease No. 4, made in 1920 to the Sun Company and extended in 1924 by a lease to the same lessee then having the name Sun Oil Company, produced great quantities of oil and gas both before and after Aurelia Mitchell's death, paying royalties both to her and to her trustees. The royalties paid during the 13 year period beginning with 1940, the year of Aurelia Mitchell's death, and ending with 1952 amounted to $50,404.-36. Lease No. 7, covering the 50 acres immediately east of the Sun leasehold, was made to the Yount-Lee Oil Company, and this leasehold also produced great quantities of oil and gas during Aurelia Mitchell's lifetime. This Yount-Lee 50 acres is now the western 50 acres of the leasehold conveyed to Gainer by the trustees' lease of August 15, 1946, ratified by the trustees by instrument dated February 3, 1947, pursuant to a decree of the trial court in another cause. This is the lease referred to in Finding 8 of the trial court's Original Findings. Leon Mitchell testified that productive wells were drilled on this 50 acre tract under the Gainer lease, and the Gainer lease was still in force when this cause was last tried. It had produced large royalties payable to the estate, a part of these royalties coming from the Yount-Lee 50 acres and the rest from the 150 acres immediately to the east which had been leased to Sun Oil Company in 1935 by Lease No. 13, supra.

Leon Mitchell also testified as follows:

"Q. That 400 acre tract, 200 acres of that was owned by your mother and 200 acres owned by your father has been pretty well taken up with oil locations, oil well refuse pits and that sort of thing? A. That's right.

"Q. So that the surface of that 400 acres is not useable for farming and that sort of thing? A. That's right.

"Q. It is located on the outskirts of Liberty? A. Yes, sir.

"Q. You have been unable to lease any part of the surface other than for oil field shacks? A. That's right."

The trial court has made these findings of fact:

"1. During the lifetime of Aurelia Mitchell and after her death the 400 acre tract of land situated in the M.G. White League in Liberty County, Texas, said land hereinafter being referred to as the '400 acre tract', was regarded by the owners thereof as a unit, that is, as one tract of land.

"2. During the lifetime of Aurelia Mitchell oil and gas leases upon various portions of the 400 acre tract were repeatedly executed by Aurelia Mitchell and others.

"3. During the lifetime of Aurelia Mitchell the principal use and the generally recognized use of the 400 acre tract by the owners thereof was for the production of oil and gas.

"4. During the lifetime of Aurelia Mitchell the leasing of various portions of the 400 acre tract for oil and gas purposes was by the owners thereof generally recognized as a means of realizing income from the 400 acre tract through the receipt of bonus money and delay rentals.

"5. Every portion of the 400 acre tract that is now producing oil and gas was during the lifetime of Aurelia Mitchell covered by one or more oil and gas leases executed by Aurelia Mitchell and others.

"6. During the lifetime of Aurelia Mitchell an oil and gas lease to Sun Oil Company was executed on the west 100 acres of the 400 acre tract by Aurelia Mitchell and others.

"7. During the lifetime of Aurelia Mitchell oil and gas wells were drilled on said 100 acres under said lease and oil and gas were produced from said wells; and at the death of Aurelia Mitchell oil and gas were being produced under said lease from said wells and oil and gas are currently being

produced under said lease from said wells.

"8. After the death of Aurelia Mitchell and in the year 1946, the trustees of the Aurelia Mitchell trust executed an oil and gas lease to C. S. Gainer, Jr., upon the west 200 acres of the east 300 acres of the 400 acre tract. [This description is incorrect in terms, although the error is not material; the land leased is described as the *east* 200 acres of the *west* 300 acres.]

"9. Oil and gas wells have been drilled on the above described 200 acres under the above described lease; and oil and gas have been produced and are currently being produced from said wells.

"10. At the time of Aurelia Mitchell's death the above described 200 acres was under oil and gas lease that had been executed by Aurelia Mitchell and others during her lifetime but no producing oil or gas wells had been drilled on said 200 acres under said oil and gas lease during the lifetime of Aurelia Mitchell and said oil and gas lease expired after her death and prior to the execution of the above described oil and gas lease to C. S. Gainer, Jr.

\* \* \* \* \* \*

"14. During the lifetime of Aurelia Mitchell, an oil and gas lease was executed to the Yount-Lee Oil Company on 50 acres of the 400 acre tract adjoining the 100 acre Sun Oil Company lease on the East by Aurelia Mitchell and others.

"15. During the lifetime of Aurelia Mitchell, oil and gas wells were drilled on the said 50 acres under the said lease executed by Aurelia Mitchell and others to the Yount-Lee Oil Company, and oil and gas were produced from said wells.

"16. The West 200 acres of the 300 acres [See comment on Finding 5]

of the 400 acre tract described in the lease from the trustees of the Aurelia Mitchell Trust to C. S. Gainer, Jr., contained the 50.acres above mentioned which had been leased by Aurelia Mitchell and others to the Yount-Lee Oil Company and on which 50 acres oil and gas had been produced from a number of wells for many years during the lifetime of Aurelia Mitchell.

17. I find that each and all of the trustees of the Aurelia Mitchell Trust Estate have in all things and at all times acted in good faith."

On the evidence and the findings stated, the questions to be determined are, whether the "open mine" doctrine would be applicable to any part of the 400 acres if the will does not preclude this, and if so, to what parts of said 400 acres. By "open mine" doctrine we mean the rules of decision which give to a life tenant, as income, royalties from the minerals produced from the land subject to his life estate. For an encyclopedic annotation concerning the rights of life tenants and remainderman to royalties see 18 A.L.R.2d 98.

■ First: We note the following statement in Youngman v. Shular, Tex., 288 S.W.2d 495, at page 496: "In determining whether the 'open mine' doctrine applies, no distinction is made between a life tenant who holds a conventional life estate and one who holds a legal life estate."

■ Second: We have concluded, for reasons stated below in part III of this opinion, that the "open mine" doctrine should be used to determine what the beneficiaries' rights to the oil and gas royalties are.

Third: If the rights of the income beneficiaries were conventional life estates not limited by the written instruments involved so as to exclude the doctrine, the "open mine" doctrine would clearly be applicable to the Sun Oil Company leasehold in the west 100 acres of the 400 acre tract, and the

life tenant, by virtue of the doctrine, would be entitled to the oil and gas royalties from this leasehold, because testatrix, the owner of the preceding estate of inheritance, had leased her interest in this tract and production of oil and gas under the lease had occurred before and after testatrix's death, down to the date when the cause was tried; and the lease, of course, was still in force at that time. This is the sort of case with which the "open mine" doctrine originated. After testatrix' death, some wells were drilled on this 100 acres under this lease, and oil and gas were produced from these wells, but royalties from this production were only a part of the profit which the testatrix had created. See Youngman v. Shular, supra; Lawley v. Richardson, 101 Okl. 40, 223 P. 156.

Fourth: We come now to the lease referred to in Finding 10, supra. This lease would cover the 200 acres now covered by the lease to Gainer referred to in Finding 8. Finding 10 has not been attacked by the parties, but such a lease was not proved and the finding is wrong, and so we cannot be sure what lease the trial court had in mind. Of this 200 acres, the eastern 150 acres was leased to Sun Oil Company in 1935 by lease No. 13, supra, and the certificate of Mr. Montgomery, manager of the Title and Rental Department of the Sun Oil Company having jurisdiction of this lease, states in substance that the lease was kept in force by delay rental payments until April 18, 1945, but lapsed on that date. This certificate is in evidence as proof of its contents and is not contradicted. The other 50 acres of the 200 acres covered by the lease referred to in Finding 10 is the Yount-Lee 50 acres, leased by lease No. 7 of the table above, and the trial court made no finding as to when this lease ended, although Finding 10 necessarily implies that it did end before testatrix' death. Recitals in Mr. Owens' certificate of tabulations, which seem to have been accepted as competent evidence if grounds of objection not pertaining to competency were not valid, show that Yount-Lee transferred the lease to Morrow on August 1, 1935, who transferred it that day to Stanolind Oil & Gas Company; that Stanolind operated the lease until November 1, 1938, and on that date assigned it to Texas Pipe & Supply Company which, on that date, "assigned the operation of the property to G. R. C. Oil Company, Inc." Texas Pipe & Supply released its interest, not describing that interest, by an instrument dated November 28, 1939, not quite four months before testatrix died, and Stanolind, for reasons not explained but seemingly inconsistent with Mr. Owens' statement of transfer to Texas Pipe & Supply, released its interest, not describing that interest, in sands below 4,000 feet, by an instrument dated June 5, 1940, not quite three months after testatrix died. No release from G. R. C. Oil Company is in evidence. Leon Mitchell, Trustee, gave some testimony indicating that the Yount-Lee lease had not wholly expired before testatrix' death. He testified first that there were some wells on the Yount-Lee 50 acres when his mother died. Next, that new wells were drilled on this 50 acres after his mother's death. "Q. They were drilled on the same tract of land that was producing oil at the time of your mother's death? A. Yes." However, he testified later: "Q. After the Yount-Lee 50 acre lease next adjoining the Sun Company 100 acre lease, after that expired, did you and your mother, as Trustee, lease to the Sun Oil Company 150 acres? A. We did. "Q. That lease is in evidence? A. Yes, sir." This Sun Oil Company 150 acre lease is lease No. 13, supra, made in 1935. At that time, according to Mr. Owens' certificate, which seems to be based on the Sun Oil Company records, the Yount-Lee lease was being operated by Stanolind; and the table of oil runs from the Yount-Lee leasehold by Sun Pipe Line Company shows that during the four years beginning with 1935 and ending with 1938, Sun Pipe Line Company took 57,815.67 barrels of oil from this 50 acre tract. Leon Mitchell's last statement is evidently wrong, as his recollection after so many years might well be,

and the evidence summarized strongly indicates that the Yount-Lee lease was at least in part in force when testatrix died. But regardless of these matters and also regardless of the fact that Finding 10 is wrong, we shall have to treat Finding 10 as impliedly finding that the Yount-Lee lease, rather, the rights of the lessee thereunder, did come to an end before testatrix' death because Finding 10 has not been attacked. But the date when lessee's rights under the Yount-Lee lease came to an end has not been found by the trial court and if this actually did happen, the date must have been near the time of testatrix' death.

The fact that the Yount-Lee lease may have expired before testatrix died does not necessarily affect our determination of the question, whether the "open mine" doctrine is applicable, or not, to the Yount-Lee 50 acre tract. That this tract produced oil and gas under the Yount-Lee lease during testatrix' lifetime is undisputed and the trial court has found that it did, in Findings 14, 15 and 16, above. By way of illustrating these findings, we note that the table at S. F. 782 shows that the Sun Pipe Line Company took 496,074.03 barrels of oil, worth $466,308.46, from this tract during the period beginning with 1929 and ending with 1938. We note further that Mr. Jones' certificate at S. F. 783, et seq., shows that 19 producing wells were drilled on this tract during 1927, 1928 and 1929. A few months after testatrix died, Leon Mitchell, Trustee, and other descendants of testatrix made an oil and gas lease on the Yount-Lee 50 acres to Luckel for a primary term of 60 days, and still later, in 1946, this 50 acres was included in the lease to Gainer referred to in Finding 10. It is the western 50 acres of the Gainer leasehold and production of oil and gas has been made from it under the Gainer lease.

■ It has been frequently held that where the onwer of the preceding estate of inheritance had opened and worked a mine and then ceased to work it under circumstances showing that he had not decided to abandon the mine and use the land for another purpose, the "open mine" doctrine applied to the mine just as it did to a mine which was worked continuously, and that the succeeding life tenant was entitled to the royalties from production started up again after the life estate had vested in possession. The cessation in mining was considered to be only temporary, and temporary cessation was considered to be ineffective to end the operation of the "open mine" doctrine. See Gaines v. Green Pond Iron Mining Company, 33 N.J.Eq. 603; Billings v. Taylor, 10 Pick., Mass., 460, 20 Am.Dec. 533; Neel v. Neel, 19 Pa. 323; Andrews v. Andrews, 31 Ind.App. 189, 67 N.E. 461; Cypress Creek Coal Company v. Boonville Mining Company, 194 Ind. 187, 142 N.E. 645; Hook v. Garfield Coal Company, 112 Iowa 210, 83 N.W. 963; Tomlinson v. Humpich, 198 Ky. 474, 248 S.W. 1016.

We see no reason why the rule concerning temporary cessation should not be applied to the Yount-Lee 50 acre tract, bearing in mind the character of the land and the long use of the land for oil and gas purposes made by testatrix. The 50 acre tract adjoined a producing 100 acre tract, the Sun Oil Company 100 acre leasehold. The rest of the 400 acres to the east of it had been frequently leased for oil and gas purposes and at least the 150 acres immediately to the east of it was under testatrix' lease when testatrix died. It was, itself, for a long period of time, highly productive of oil and gas, and its sands were not exhausted during testatrix' lifetime, as the production from the tract under the Gainer lease shows. The value of the land was for oil and gas purposes, long known to and acted on by testatrix, to produce income. When we consider all of these circumstances and others stated above and the findings quoted above, it seems to us to have been clearly proved that testatrix had no intention of abandoning her use of the 50 acres for oil and gas purposes. The expiration of the lessee's right under the

Yount-Lee lease might well be a circumstance to the contrary in a different state of facts, and in Daniels v. Charles, 172 Ky. 238, 189 S.W. 192, the Court of Appeals of Kentucky held, in effect, that the life tenant had no power to give a lease where a contract for lease made by the prior owner had expired before she made her own lease. However, this decision was cited by the Court of Appeals in their later decision of Tomlinson v. Humpich, supra, in which they applied the rule concerning temporary cessation of mining operations, and it is evident that they did not consider their decision in Daniels v. Charles to be inconsistent with their decision regarding temporary cessation in mining.

Whether the production under the Gainer lease from this 50 acres has come wholly from new wells the evidence does not show; but it is a consequence of the decision in Youngman v. Shular, supra, that this matter is immaterial. Because of the rule about temporary cessation, the original opening of the mine, the original drilling of productive wells on the land, would seem to have the same effect as the existence of the owners' lease in force at the time of his death and of the vesting in possession of the life tenancy.

Fifth: We turn now to further consideration of the lease referred to in Finding 10, supra, and to the testatrix' lease to the Sun Oil Company in 1935 on the 150 acres immediately east of the Young-Lee 50 acre tract, being Lease No. 13 of the table above. This is the eastern 150 acres of the tract leased to Gainer by the lease referred to in Finding 8. The 200 acres covered by the lease referred to in Finding 10 covers the entire Gainer leasehold. According to Finding 10, the lease referred to therein was made by testatrix and terminated after her death, without production. According to the evidence, testatrix' aforesaid lease to Sun Oil Company terminated on April 18, 1945, having been kept in force theretofore by delay rental payments. A little more than a year after the Sun Oil Company 150 acre lease ended, descendants of testatrix, including her trustees, began the execution and delivery of a series of leases to Gainer covering the 200 acres referred to in Finding 10 and the Sun 150 acres. There are 8 of these leases in evidence, seven made in 1946 and one made in 1948. The trustees' lease to Gainer referred to in Finding 8 is one of these and was ratified by the trustees pursuant to a decree of the trial court in another cause.

The situations presented by the 200 acre lease referred to in Finding 10 and the Sun 150 acre lease are the same (excluding the Yount-Lee 50 acres from the 200 acres or treating that lease as expired before testatrix died,) namely, a lease by testatrix for oil and gas purposes, in force when testatrix died but terminating without production, followed after an interval by a lease from her trustees. We may disregard all of the leases except the one made by the trustees, referred to in Finding 8. The first question to be decided is, whether the trustees' lease should be considered as opening a new mine in land to which the "open mine" doctrine has previously had no application, or as being only a renewal, continuing in existence a previous condition or use of the land? If the former, the "open mine" doctrine is inapplicable to the 150 acres immediately east of the Yount-Lee tract. And there is another question, namely, whether the fact that the trustees' lease is based, at least in part, on a decree of the trial court authorizing that lease, makes the "open mine" doctrine inapplicable. We assume, for the purposes of discussion, that the decree was necessary to make the lease effective.

■ We hold that the trustees' lease to Gainer, with its subsequent ratification by the trustees pursuant to the trial court decree, is to be treated as a renewal, that is, as only a continuation of the previous status or condition of the land leased which existed at testatrix' death, both as to the Yount-Lee 50 acres and as to the 150 acres immediately to the east thereof.

This previous condition of the Yount-Lee 50 acres was fixed and determined by two factors, first by the production of oil from it under testatrix' lease, a condition or use not abandoned by testatrix, and second, by the 200 acre lease covering this tract in part, referred to in Finding 10. The previous condition of the 150 acres immediately to the east was fixed and determined by the aforesaid 200 acre lease or by the 150 acre lease to the Sun Oil Company if that be the lease truly in force on that 150 acres when testatrix died. For the rights of the life tenant under the "open mine" doctrine vest, if at all, as of the time this tenant comes into possession, and in the case at bar this time is the time when testatrix died; the trust created by testatrix' will and the rights of the beneficiaries under the trust took effect as of the time of testatrix' death, and so did any rights which they may have by virtue of the "open mine" doctrine. It was testatrix' leases, and in the case of the Yount-Lee 50 acres, production thereunder for years, which created these rights; production under the 200 acre lease or the 150 acre Sun lease after testatrix' death would prevent the expiration of the lease but would create no right, would make no dedication to a particular use, would express no intention, would indicate no expectation by the owner, would create no profit or fund, would make no conversion to personal property not done or made, in fact or in law, by the testatrix' lease itself. So far as we can tell, the trustees' lease to Gainer adds no burden to the inheritance in the 150 acres east of the Yount-Lee 50 acres which the testatrix' lease did not put on it.

Must the royalty come out of the very lease made by the testatrix in order to constitute income payable to the life tenant? In Daniels v. Charles, 189 S.W. 192, by the Court of Appeals of Kentucky, which we have referred to above, the contract of the husband and wife to lease land for coal mining had actually expired before the husband died, and the wife's new lease, purportedly made under this contract, was not made until several years after the husband's death. The Court said that if the contract had been in force the wife would have been entitled to the royalties, but they denied her the royalties because the contract had expired before she made her lease. The decision is not in point on the facts since the contract expired before the husband died and no rights under the "open mine" doctrine vested in the wife at the time of his death, but the court's language, if not limited to the facts, might deny the life tenant rights under the "open mine" doctrine even under the facts pertaining to the 200 acres and 150 acre leases by testatrix now being discussed. However, such a limitation on the "open mine" doctrine seems inconsistent with the rule which determines the life tenant's rights as of the time his estate vests in possession, and we see no reason why such a limitation should be made. If the lease by the owner of the preceding estate of inheritance makes the "open mine" doctrine applicable to production under that lease when no production is made until after the life estate does vest in possession, we see no reason why the trustees' lease should not be treated as renewing, continuing, the condition created by the testatrix' lease.

■ Sixth: This leaves for consideration the rest of the 400 acre tract, on which no lease was in force when testatrix died. This part is the eastern 100 acres. According to the trial court's findings and the evidence we have summarized which explains and makes clear what those findings mean, testatrix had plainly shown an intention to use her one-half interest in the 400 acres for mineral purposes and nothing else, and under some forms of language used to state the "open mine" doctrine, conduct such as this might well be held enough to make that doctrine applicable to the entire tract. Thus in Swayne v. Lone Acre

Oil Company, 98 Tex. 597, 86 S.W. 740, 742, 69 L.R.A. 986, the court uses the word "devote", referring to land "devoted to mining purposes," and this the testatrix might well be said to have done with her one-half of the 400 acres. However, the court said nothing else which indicates that they intended a rule which the facts did not require them to announce, and we have seen no decision in which the court applied the "open mine" doctrine because of the facts pertaining to the 100 acres now under consideration. The will itself contains no express grant of a power to the trustees to lease land for oil and gas purposes, and because of this and the decision in Avis v. First National Bank of Wichita Falls, 141 Tex. 489, 174 S.W.2d 255, decisions from other jurisdictions are inapplicable which apply the "open mine" doctrine because of general or specific powers given trustees to lease land for mineral purposes. To apply the "open mine" doctrine to the 100 acres now under consideration requires an extension of the rule beyond the limits of any situation to which we have found the doctrine applied, and we conclude that the doctrine should not be applied to this tract and that leases for oil and gas purposes made of this tract will come strictly within the decision made in Mitchell v. Mitchell, supra.

Our conclusions deny effect to the trial court's finding No. 1, that the 400 acres was considered to be a unit, but regardless of testatrix' mental attitude, she actually leased only specific parts of this unit; only these specific parts were devoted to mineral uses by her affirmative act; the profit, the fund, was always created in specific parts of the 400 acres, at different times; any conversion to personal property was always made with reference to specific tracts leased. (This repetition refers to certain forms of expression used in decisions to state the reason for the "open mine" doctrine.)

And see Westmoreland Coal Company's Appeal, 85 Pa. 344.

### III.

#### *The interpretation of the will.*

In substance, testatrix' will devised in trust all of her property "in Liberty County—including oil and gas leases—the *income from said trust* to be for the benefit of my children (Theresa Perkins, a daughter, was excepted) and my grandchildren by my daughter Theresa—." The will provided further: "It is my *desire, as far as possible,* that this part of my estate be allowed to *accumulate* for the benefit of my grandchildren and great grandchildren, provided, however, that after payment of my debts, the *income from said property* shall be paid to my children and the children of Theresa Perkins, share and share alike, that is, one share jointly to all of the children of Theresa Perkins, and one share to each of my children except Theresa Perkins." Other parts of the will provide for payment in succession to these beneficiaries. It is not necessary to state other parts of the will.

On the first appeal, in Mitchell v. Mitchell, 151 Tex. 1, 244 S.W.2d 803, 805, the Supreme Court held that the royalties paid to the trustees under the Gainer lease referred to in Finding 8 of the trial court, were part of the corpus of the trust estate and not income payable to beneficiaries. The court's discussion of the matter or interpretation is in general terms, but the court made the following statement preliminary to their discussion:

"This controversy involves royalties arising from Aurelia Mitchell's one-half interest in 200 acres of the Liberty County land covered by the oil and gas lease executed by her testamentary trustees to C. S. Gainer, Jr. During her lifetime another 100 acres, off the west side, had been leased to the Sun Oil Company. Still another 100 acres have not been

leased. Prior to Aurelia Mitchell's death the 200 acres covered by the Gainer lease had not been leased or drilled, and rights acquired under the 'open mine' doctrine are not applicable here. Thompson v. Thompson, Tex.Sup., 236 S.W.2d 779; Swayne v. Lone Acre Oil Co., 98 Tex. 597, 86 S.W. 740, 69 L.R.A. 986, 8 Ann. Cas. 1117; Petrus v. Cage Bros., Tex.Civ. App., 128 S.W.2d 537, writ refused. Therefore the main question presented here is whether royalty received from an oil and gas lease executed after the death of the testatrix by her testamentary trustees, and after the creation of the life estate, is 'income,' distributable to the life tenants, or is a part of the corpus of the estate, to be received by the remainderman."

This statement qualifies and limits the general nature of the discussion following, and shows that the court acted on a state of facts profoundly different from that proved on the second trial, that the court excluded the "open mine" doctrine from their consideration, that the court did not determine the parties' rights to royalties paid under the Sun Oil Company lease on the western 100 acres of the 400 acres, and that the question actually decided by the court is only *one* of the *questions* which the facts proved on the second trial present for decision. The extraordinary difference between the facts on which the Supreme Court acted and those proved on the second trial will appear from a comparison of the evidence and findings stated in this opinion with the statements in the Supreme Court's opinion. To illustrate, the Supreme Court's statement that "prior to Aurelia Mitchell's death the 200 acres covered by the Gainer lease had not been leased or drilled, and rights acquired under the 'open mine' doctrine are not applicable here" is incorrect, as applied to the facts in this record. The table of leases set out above shows that *twelve* of these leases, in all of which testatrix was a lessor, covered parts of the Gainer lease-

hold, and that at one time or another every part of the Gainer leasehold was under a lease made by testatrix. There is no dispute as to this important fact. The bonuses for these leases exceeded $48,000. In addition to these matters and to repeat, new parties have been brought into the case who are interested in the questions decided by the Supreme Court but are not bound by that court's judgment, and are also interested in all of the other questions involved in the appeal now pending before us and the case actually involves land not involved in the Supreme Court's opinion. We must, therefore, determine again, from the facts now in proof, what right the beneficiaries of the trust have to oil and gas royalties from the 400 acre tract.

■ As we have stated, it is our conclusion that the "open mine" doctrine should be used to determine the beneficiaries' rights to oil and gas royalties, first as a circumstance supporting our interpretation of the direction to pay income from the property devised, which included oil and gas leases, and next as the basis for our conclusion respecting the Yount-Lee 50 acres and the 150 acres immediately east of it. The "open mine" doctrine has frequently been applied in determining what income a beneficiary of a trust is entitled to. See Scott on Trusts, Sec. 239.2; Bogert on Trusts & Trustees, Sec. 828, pp. 294 to 299, inclusive; Page on Wills (Lifetime Edition), Sec. 1162; 18 A.L.R.2d 160, Section 21 et seq. The use of a rule of decision to determine the testatrix' intention respecting the meaning of "income" is exemplified in the Supreme Court's own opinion at 244 S.W.2d 806 where the Court used for that purpose the rule concerning new mines on land not previously mined. Then, there is no expression of intention in the will which precludes our using the doctrine (the expression of desire for an accumulation may be reconciled with our interpretation of the word "income"); and as statements made in this opinion show, application of the doctrine is but an extension of testatrix' own course of con-

duct, exemplified by many transactions over many years, showing her use and devotion of the land to oil and gas purposes for the purpose of earning very large sums of money. The character of the land as oil producing property, the fact that it is valuable for this purpose and that certainly its main value is for that purpose, these facts long known to and acted on by testatrix, point toward the reliability of the doctrine as a test of Aurelia Mitchell's intention. There is an affirmative direction in the will to pay out the income from the property devised, including oil and gas leases, and there were at least two of these leases in force when testatrix died, the Sun lease on the western 100 acres, still in force, and either the 200 acre lease referred to in Finding 10 or the Sun lease of 1935 on the 150 acres immediately east of the Yount-Lee 50 acres. Both of these latter leases expired after testatrix' death, to be followed by the trustees' lease to Gainer. The obvious and natural interpretation of the direction to pay income from the leases is that it includes royalties; there seems to be no reason why it should be interpreted otherwise. Are we to say that income from these leases might include oil and gas royalties but not such royalties from a renewal lease on the same land, as the trustees' lease to Gainer was in effect? The land leased was devised in trust, too. Did testatrix intend income from this land to mean one thing while her lease was in force and her interest in the land leased was only a possibility of a reverter? Or did she mean the word "income" to have the same meaning respecting the same land throughout the administration of the trust? That would ordinarily be true. Testatrix said nothing in her will about her trustees' making oil and gas leases but she said nothing in the will about any power whatsoever to be exercised by the trustees. No power was conferred by her upon the trustees except such as may be implied from the devise in trust and such as the District Court may give them from time to time. Would it be improper to use the "open mine" doctrine to determine whether oil and gas royalties from land covered by her leases when she died were income or corpus of the estate—when we consider the facts and the actions of the testatrix pertaining to said land? We think it not improper to make that use of the doctrine.

■ Turning next to the quotation made from the will: The word "income" is not defined except by implication from the statement "income from said trust" and from the subsequent statement "income from said property." Since the latter form of expression is made in connection with the statement of desire for accumulation and is so definite that misunderstanding by testatrix was unlikely, we will construe it literally, that is, as meaning income from the property devised in trust, which included oil and gas leases, as the language quoted shows. And as we have stated, there were at least two of these leases, the Sun Oil Company lease on the western 100 acres and either the lease referred to in Finding 10, or the lease to Sun Oil Company on the 150 acres immediately east of the 50 acres. It would seem then, also as we have stated, that the direction to pay out the income from these leases would include the royalties paid under these leases, for such would be the natural and obvious meaning to give the word "income"; and this result is perfectly consistent with the result of an application of the "open mine" doctrine to this 100 acres. We think the direction to pay and the "open mine" doctrine are circumstances mutually supporting; the doctrine as a circumstance indicating the proper construction of the direction to pay, and the consistency of the latter with the operation of the doctrine as showing the applicability of the doctrine to a trust like this.

■ We have held that the "open mine" doctrine is also applicable to the 200 acres immediately east of the Sun 100 acres. The lease in force on this 200 acres or on the 150 acres east of the Yount-Lee 50 acres was also devised in trust, and if royalties

were, or had been, produced under said lease, the conclusions we have made about the Sun Oil Company leasehold in the western 100 acres would also apply to these leases and for the same reasons. These leases, of course, have expired, so that the specific devise of income from said leases is not as directly applicable to the land covered by these leases as it was in the case of the Sun Oil Company lease on the western 100 acres, but under the "open mine" doctrine oil and gas royalties from this land would constitute income. The same conclusion applies regarding the Yount-Lee 50 acres, regardless of the specific devise of income from oil and gas leases. Under the circumstances, the income beneficiaries should have the same right to the royalties from the Gainer lease that they would have had to the lease or leases which were renewed by the Gainer lease, and this right, as we have indicated, included the oil and gas royalties.

The members of this court are not satisfied that oil and gas royalties which may be paid out of production from the eastern 100 acres of the 400 acre tract ought to be distinguished from the royalties paid out of production from the western 300 acres of that tract, but the "open mine" doctrine does not apply to the eastern 100 acres and the expression of desire for an accumulation cannot be given effect, so far as the record before us shows, except as regards land not subject to the "open mine" doctrine. The result seems artificial but the desire for accumulation would otherwise be nullified.

██ Since only something in the nature of income can be accumulated, the direction to pay income is inconsistent with the statement of a desire for accumulation, unless "income" be defined so as to permit an accumulation of something; but the expression about accumulation is both precatory in form and qualified by the words "as far as possible". It would seem that language as indefinite as this, when followed by a positive order to pay out income from the property devised in trust, was not intended to qualify the literal meaning we have given the latter statement and to exclude from income the payments of royalties made under the oil and gas leases devised in trust, or from renewals thereof, which are, after all, not mentioned in the will. It seems to us that the testatrix' desire for an accumulation can be reconciled with the direction to pay income and both can be given effect by limiting accumulation, so far as oil and gas royalties are concerned, to royalties from lands not under lease when testatrix died, and at least the eastern 100 acres of the 400 acre tract was not then leased. Such royalties would be governed by the Supreme Court's holding in the first appeal that royalties from the trustees' lease on land not leased before was a part of the corpus of the trust estate.

These conclusions adjudicate the beneficiaries' rights to oil and gas royalties produced from the 400 acre tract. Of these conclusions, those pertaining to the 200 acres now covered by the Gainer lease are in conflict with those of the Supreme Court on the first appeal, but this conflict has occurred because of the new parties and the difference between the facts proved on the two trials of the cause.

## IV.

### Other Questions.

Of the various points assigned in the brief of Cornelius Mitchell, et al., we overrule Point 3 on its merits. Their points 4, 5 and 6 assign error to the admission of certain documents but the action was harmless to them and these points are overruled for that reason. Their points 8 and 9 are not decided. We do not understand their point 10. We find no discretionary powers in the will concerning the payment of income and so we overrule Point 10. As regards the points assigned in the brief of trustees Leon and Vick Mitchell, we do not decide point 8, except as regards monies these trustees did not account for, and we do not decide their counterpoints first and second. The two points assigned in the brief of the

American National Bank, trustee, are considered, since it is no longer a trustee and has been dismissed as a party to this cause.

## V.

### *Judgment.*

Insofar as the judgment of the trial court declares oil and gas royalties from the 400 acre tract to be part of the corpus of the trust estate, said judgment is affirmed as regards the eastern 100 acres of the 400 acres and other Liberty County lands devised in trust except that now to be mentioned, but is reversed as regards the western 300 acres of said 400 acres; and judgment is here rendered declaring oil and gas royalties from said 300 acres to be income, payable to the life income beneficiaries of the trust.

Further, insofar as the judgment of the trial court has adjudged appellants Mary Prophet and husband and Agnes King and husband and the group of appellants headed by Cornelius Mitchell, et al. to be liable in money, to the trust or to the trustees or to any other person, and has authorized the trustees to withhold income from them, said judgment is hereby reversed and judgment is rendered that all other parties take nothing against said appellants.

It is a result of these two adjudications that the trustees can not perform the trust, can not administer the trust in accordance with the will of testatrix. It is an additional result that if the awards of money recovery against the beneficiaries who did not appeal are left in force, with the provisions authorizing the trustees to withhold income payable to said beneficiaries, money will go into the corpus of the estate which will pay an income to the appealing beneficiaries, in flat conflict with the theory on which the appealing beneficiaries have contested and won this appeal; and if the non-appealing beneficiaries are released from their obligations to reimburse the trust, then the trustees have been deprived of their right of recoupment from said beneficiaries. The case is not one where a judgment has been rendered solely for the appellee; all of the money recoveries awarded by the judgment were primarily for the reimbursement of the trust estate and secondarily, for the reimbursement of the trustees. Under the circumstances, it seems to us that the awards of money recoveries against the non-appealing beneficiaries and the provisions authorizing the trustees to withhold income from them must also be reversed and, still further in consequence, that the award of a money recovery against the trustees must be reduced by the amount of the sums awarded against the beneficiaries, the appealing ones and those not appealing.

However, the trustees Leon and Vick Mitchell failed to account for $28,002.87, and judgment against them for this amount is affirmed.

Provisions of the trial court's judgment not inconsistent with the foregoing will be affirmed.

The above opinion was prepared by Justice Walker while he was a member of this court. It was not completed and ready to be filed until today, when it is filed by the present members of the court as their opinion in the case.